**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 40716**

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENTAL RIGHTS OF JANE (2013-04) DOE. | 2013 Unpublished Opinion No. 557 |
| _____ | Filed: June 28, 2013 |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | Stephen W. Kenyon, Clerk |
| Petitioner-Respondent, | THIS IS AN UNPUBLISHED OPINION AND SHALL NOT BE CITED AS AUTHORITY |
| v. | |
| JANE (2013-04) DOE, | |
| Respondent-Appellant. | |
| _____ | |

Appeal from the Magistrate Division of the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Carolyn M. Minder, Magistrate.

Decree terminating parental rights, <u>affirmed</u>.

Alan E. Trimming, Ada County Public Defender; Adam C. Kimball, Deputy Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Mary Jo Beig, Deputy Attorney General, Boise, for respondent.

_____

GUTIERREZ, Chief Judge

Jane (2013-04) Doe (Mother) appeals from the magistrate's decree terminating her parental rights to her daughter, asserting there was a lack of substantial and competent evidence to show she neglected her daughter and is unable to discharge her parental responsibilities for a prolonged, indeterminate period of time. Additionally, Mother argues the magistrate erred in finding that substantial and competent evidence showed termination of her parental rights was in the best interests of the child. We affirm.

1

# I.

# FACTS AND PROCEDURE

The Idaho Department of Health and Welfare (Department) filed a Child Protective Act (CPA) case involving Mother's minor daughter in December 2011 after the daughter was removed from Mother's home and taken into shelter care. Prior to December 2011, Mother had been involved in seven prior referrals to child protection services concerning the child's exposure to substance abuse by Mother, neglect, a hazardous home environment, violence, and Mother's prostitution. The present case arose because Mother left the daughter with a friend while Mother sought treatment for drug abuse and the friend could no longer care for the daughter. At the time the Department took the daughter into its custody, the father had recently been paroled after serving three years in prison for domestic battery with traumatic injury against Mother while she was pregnant with the daughter. The father was subject to a no-contact order on behalf of Mother and the daughter as protected parties and, therefore, could not take custody of the child. Due to her abandonment of the child, the State charged Mother with felony injury to child. Mother pled guilty to the charge and eventually the court placed her on probation.

After a hearing in January 2012, the magistrate vested legal custody of the daughter with the Department. The Department filed a case plan for Mother in early February. Mother had admitted to a need for substance abuse treatment, in addition to treatment for a prior diagnosis of bipolar disorder. To address these and other problems, the case plan required Mother to do the following: acquire safe and stable housing and to provide documentation regarding the same; maintain employment; participate in parenting classes; schedule and attend regular visitations with the child; identify potential placements for the daughter; complete a substance abuse evaluation and follow all of the evaluator's recommendations including any suggested treatment; and comply with the terms of her probation.

For roughly one month after the case plan was filed, Mother exercised visitation and claimed that she was employed, had begun treatment for substance abuse, and was taking parenting classes. She also obtained a mental health assessment. Subsequently in March 2012, she lost her job as a live-in nanny and, consequently, also lost housing. When this occurred, Mother admitted she was not in treatment or attending classes. At this time, she claimed to be staying with a boyfriend. Additionally, Mother opted to stop having visitations with her daughter because given her past and present life choices--including homelessness, moving

2

frequently, exposing the daughter to bad role models, and otherwise providing an unsafe environment--it was better for the daughter for Mother to not be her parent. Between the months of April and August 2012, Mother had only one visitation with her daughter, occurring on June 20. In those five months, it was unclear where Mother was staying and she did not maintain contact with the case manager or the guardian ad litem. The record shows Mother was incarcerated for a period of thirty days on new criminal charges beginning in late June.

When Mother reinitiated contact with case workers in August 2012, Mother was staying at a living facility for women recovering from substance abuse. However, she was later dismissed from the program for ongoing drug use. Mother lied to case workers about the reasons for her dismissal. Other individuals working with Mother confirmed that she continued to use drugs throughout the month of August and that Mother was not in any drug treatment program. Mother had obtained a new mental health assessment, but had not, as of that time, followed through with the recommendations from that assessment.

In September, Mother was reportedly living with a friend. At some later point that month, she stayed at a shelter for domestic violence victims, but later recanted her allegations that she was the victim of a sexual assault. After leaving the women's shelter, Mother reported being back at the living facility for women recovering from substance abuse. By the last week in September, Mother was at yet another, different living facility for individuals recovering from substance abuse.

In October 2012, Mother had a job at a local hotel, but that employment ended after only two days. She also claimed to be doing yard work for income and reported that she started drug treatment the prior month. On October 24, the magistrate conducted a permanency hearing and approved a permanency goal of termination of parental rights and adoption for the daughter. In November, Mother admitted to relapsing and again using drugs. Between September and December 2012, while Mother had reportedly been in treatment, there was testimony by witnesses that there were several weeks during that time that Mother did not attend scheduled appointments and did not give providers a way to contact her. Additionally, Mother had failed to submit to all drug testing during that time. In December, Mother qualified for state assistance and was able to obtain medication for her mental health issues. However, due to Mother's pregnancy, the treatment dosage had to be closely managed and it was unclear, as of the time of the termination hearing in January 2013, whether the dosage would have provided the desired

effect of controlling Mother's bipolar disorder because Mother had only been on medication for three weeks. Throughout August until December 2012, Mother did exercise visitation with the child. The visitation supervisor testified that Mother loved her child very much, but regularly rejected parenting advice and had difficulty controlling angry outbursts or making positive life choices to be a good role model.

After the termination hearing, the magistrate determined that Mother neglected the daughter; Mother was unable to discharge her parental duties for a prolonged, indeterminate time; and termination was in the best interests of the daughter. The magistrate entered a decree terminating Mother's parental rights in February 2013. Mother timely appeals.

## II.

## STANDARD OF REVIEW

The United States Supreme Court has held that a parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Quilloin v. Walcott*, 434 U.S. 246, 254-55 (1978). *See also In re Doe*, 146 Idaho 759, 761, 203 P.3d 689, 691 (2009). Concordantly, the Idaho Legislature has, in the CPA, directed that "the state of Idaho shall, to the fullest extent possible, seek to preserve, protect, enhance and reunite the family relationship." Idaho Code § 16-1601. Likewise, the Termination of Parent and Child Relationship Act states, "Implicit in this chapter is the philosophy that wherever possible family life should be strengthened and preserved . . . ." I.C. § 16-2001(2).

Because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is supported by "clear and convincing evidence." *Santosky*, 455 U.S. at 769. *See also* I.C. § 16-2009; *Doe*, 146 Idaho at 761-62, 203 P.3d at 691-92; *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). On appeal from a decision terminating parental rights, this Court examines whether the decision is supported by substantial and competent evidence, which means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe v. Doe*, 148 Idaho 243, 245, 220 P.3d 1062, 1064 (2009). The appellate court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order terminating parental rights. *Id.* at 245-46, 220 P.3d at 1064-65. The Idaho Supreme Court has also stated, however, that the substantial evidence test requires a greater quantum of evidence in

4

cases where the trial court finding must be supported by clear and convincing evidence, than in cases where a mere preponderance is required. *In re Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. *In re Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006). Further, the trial court's decision must be supported by objectively supportable grounds. *In re Doe*, 143 Idaho at 346, 144 P.3d at 600.

## III.

## DISCUSSION

**A. Whether Substantial and Competent Evidence Exists to Support a Statutory Ground for Termination**

A court may terminate a person's parental rights if it finds a statutory ground exists for termination and termination is in the best interests of the child. I.C. § 16-2005; *Doe v. Roe*, 133 Idaho 805, 810, 992 P.2d 1205, 1210 (1999). The magistrate found statutory grounds for termination in subsections (1)(b) and (d) of section 16-2005 of the Idaho Code, which provide as follows:

> (b) The parent has neglected or abused the child.
> . . . .
> (d) The parent is unable to discharge parental responsibilities and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals or well-being of the child.

Under subsection (1)(b), the magistrate determined that Mother neglected the child. A neglected child is defined, in relevant part, as a child:

> (a) Who is without proper parental care and control . . . necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them; . . . or
> (b) Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being;

I.C. § 16-1602(25).

Mother asserts the magistrate erred in determining that she neglected her daughter and that she is unable to discharge her parental responsibilities for a prolonged, indeterminate period because she claims a lack of substantial and competent evidence to support the three findings

used to justify those determinations.[1]  The three findings she challenges are:  Mother has historic and/or ongoing involvement with the criminal justice system and resulting periods of incarceration; Mother has demonstrated instability in both housing and employment; and Mother has historic and/or ongoing abuse of controlled substances.

## 1.   Involvement with the criminal justice system

Mother asserts she does not have a significant criminal history and that the magistrate erred in finding she has historic or ongoing involvement in the criminal justice system.  Mother points out that the offenses on her criminal record are all misdemeanors and none are for crimes of violence or resulted in prison time.

Evidence presented at trial shows that prior to the onset of this case, Mother had three separate convictions for driving without privileges; convictions for violating a court order, driving under the influence, resisting arrest, and theft by receiving stolen property; and probation violations.  Additionally, as a result of Mother's abandonment of the child, causing the daughter to be brought into care, the State arrested and charged Mother with felony injury to child.  She pled guilty and remained incarcerated from late December 2011 through early January 2012, just after the onset of this child protection case, before being released on probation.  There was an indication that Mother was again incarcerated in April 2012, though the reasons for or length of that period of incarceration is unclear from the record.  Police officers again arrested Mother in June 2012 and she spent a period of thirty days in jail on new charges until her release in July.  When Mother obtained her second mental health assessment in August 2012, she had admittedly engaged in the following behavior in the previous year:  bullying or threatening other people; starting fights; using weapons during fights; being physically cruel to other people; taking a purse, money, or other things from a person by force; breaking windows or destroying property; taking money or things from a house, building, or car; and lying to get desired things or to avoid having to do something.  In that assessment, Mother reported that in a recent fight with a boyfriend, she stabbed him with scissors.  Further, there is evidence in the record that Mother engaged in drug transactions, exposed her daughter to drugs and other hazardous environments, and at one point, may have engaged in prostitution to support her drug use.

---

[1]      Although Mother separately argues neglect and inability to discharge parental duties for a prolonged, indeterminate amount of time, the magistrate used the same factual findings to support both determinations.  Therefore, we evaluate the two arguments as one.

Mother is correct that no offense on her criminal record, prior to the injury to child conviction, is a felony or a violent offense. However, her criminal record covers a period of time beginning in 2005 and continuing through to the present. Just during the pendency of the child protection case, Mother was in custody no less than three times. Other evidence also shows that Mother had engaged in a significant amount of additional, uncharged criminal conduct, some of which involves violent behavior. The magistrate did not err, as there is substantial and competent evidence to support the magistrate's finding that Mother has historic and/or ongoing involvement with the criminal justice system and resulting periods of incarceration that impair her ability to provide a stable home for the child.

### 2. Unstable housing and employment

Next, Mother asserts the magistrate erred in finding Mother had unstable housing and employment. Mother asserts that she has been employed at various times throughout the pendency of the case. She also claims she was receiving housing assistance where the daughter could reside with her.

As to Mother's employment, testimony at the termination hearing showed that Mother claimed to have worked as a live-in nanny for approximately a one-month period of time around March 2012. By April 2012, Mother had lost the job because the friend who allegedly employed her was arrested on drug charges. Between April and August 2012, Mother did not stay in contact with case workers, with the exception of one visitation in June 2012, and did not report any employment. In October 2012, Mother reported working at a local hotel, but admitted the job lasted only two days, and claimed she was doing yard work for income. Later, Mother reported working as a dancer at a nightclub in town. She did not, at any time, provide documentation or proof of income from any of these jobs.

In relation to Mother's housing situation, multiple witnesses testified at the termination hearing that it was difficult to keep track of Mother's whereabouts. One witness testified that she was not informed by Mother about Mother's moves as they occurred, but rather the witness stated she learned of Mother's location well after the fact. During the pendency of the case, Mother's living arrangements, as established by various witnesses, were in constant flux. From late December 2011 to early January 2012 she was incarcerated. For roughly one month in February or March 2012, Mother was living with a friend as a nanny. In April 2012, she was staying with a boyfriend, but was again incarcerated sometime that month. From sometime in

April to the beginning of August 2012, Mother's whereabouts were unknown, other than a thirty-day period of incarceration from late June through most of July 2012. In August 2012, Mother was residing at a housing facility for women recovering from substance abuse, but by the end of the month, Mother was no longer allowed to stay at the recovery facility because of ongoing drug use and so Mother was staying with a friend. By September 2012, Mother was staying with yet a different friend and had a short stint at a women's shelter for domestic violence victims. She later recanted her accusations of being the victim of a sexual assault and, upon leaving the women's shelter, reported being back at the living facility for women in recovery. By the last week in September, Mother was at yet a different living facility for individuals recovering from substance abuse. Between October and December 2012, the timeline of Mother's whereabouts is not entirely clear. At some point, roughly the beginning of November, Mother left the second recovery facility and returned to the first one. However, she admitted to a relapse and again could no longer stay there. By December 17, Mother was readmitted to the first recovery living facility and was still there at the time of the termination hearing in January 2013. The program at the first housing facility for women recovering from addiction was to be for a period of eighteen months. At the termination hearing, Mother testified that her daughter could stay with her at the living facility and she was in the process of getting approved for housing assistance for when she left the housing program she was currently in.

The magistrate had an abundance of evidence supporting Mother's instability in both employment and housing. She did not provide any proof of employment during the thirteen months the child protection case was pending. Even providing her the benefit of assuming she did have some employment at various times, she did not sustain them for any significant period of time. Evidence demonstrated that Mother also did not maintain any single living arrangement for longer than a one-month period. Mother changed housing approximately ten or eleven times in thirteen months and was incarcerated on three occasions within that same span of time. Moreover, in her mental health assessment in August 2012, Mother admitted that the people with whom she had lived over the last year were not employed or in full-time school or training, were all involved in illegal activity, all used drugs, all exhibited angry behavior (shouting, arguing, fighting), all had been in drug or alcohol treatment, and none would describe themselves as being in recovery. Not only does the evidence establish that she failed to maintain a single living arrangement for more than a month, it shows that the housing she did obtain was not a suitable

8

environment for a young child. Though Mother claimed she was, at the time of the termination hearing, in a stable housing situation, she had only been at the living facility for a matter of weeks. Further, she had not yet been accepted into the housing assistance program and could only speculate that such a resource would be available upon her leaving the recovery living facility. Mother's pattern of changing residence and failing to maintain a job for any period of time during the pendency of the child protection case shows that the magistrate did not err in determining that substantial and competent evidence established Mother's instability in both housing and employment.

### 3. Abuse of controlled substances

Mother also challenges the magistrate's finding that Mother has a historic and/or ongoing problem with abusing controlled substances. She contends the magistrate failed to take into account the fact that she was in substance abuse treatment and also failed to consider testimony from her therapist indicating she was about half-way through her current treatment program. The therapist also testified that Mother was doing what was asked of her by her treatment providers, submitting to urinalysis two times per week, and attending classes. He opined that, based on her current status, Mother would have a positive outcome resulting from the substance abuse treatment.

Testimony established that Mother acknowledged that she needed substance abuse treatment and to address her bipolar disorder even before the shelter care hearing in January 2012. She had previously admitted using marijuana and methamphetamine. In fact, Mother's daughter tested positive for marijuana at birth. Prior to the onset of the current case, Mother had been in an inpatient facility for drug treatment, reported being involved in drug deals, and exposed the daughter to methamphetamine and other drug use. As part of the case plan, Mother was required to seek substance abuse treatment. Though she claimed to have started treatment in March, by April she admitted she was not in any treatment program. There is testimony that Mother's June arrest was related to drugs. After being released from custody, Mother admitted to extensive drug use. In the August 2012 mental health assessment, Mother admitted to using methamphetamine on fifty-four of the prior ninety days. Evidence showed Mother used the drug at various times, both intravenously and by smoking it. She again, by her own admission, used methamphetamine in November, during which time she was pregnant.

9

The therapist who provided Mother personal counseling and oversaw her treatment and progress at the treatment center did testify as to Mother's progress. He reported that he conducted individual therapy sessions with Mother and that Mother had been attending group sessions. Mother first came to the treatment program in September 2012, but the therapist testified that Mother did not begin individual or group counseling until October. He testified that her consistency in attending treatment was better with the individual sessions than with the group sessions, but it improved in the month of November. He further testified that he attended a medical appointment with Mother around December 22, so she could obtain treatment for her bipolar disorder. Based on her attendance of the group and individual therapy sessions, her submission to and clean results from urinalysis drug tests, and other progress, the therapist testified that Mother was in the middle of her treatment and would likely have a positive outcome. He acknowledged that Mother had experienced some unsuccessful attempts in the past, but the therapist believed she was at a point to be able to learn from past mistakes and move forward. He stated she would need on-going mental health treatment and at least three to six months of further treatment for her substance abuse issues.

Despite the evidence presented regarding Mother's progress, the magistrate found the therapist was not credible. Specifically, other evidence tended to show that Mother was sporadic in attending group sessions and that there were several weeks in December that Mother did not make scheduled appointments and could not be contacted. Moreover, although the therapist testified that all of Mother's drug tests came back clean, he neglected to state that Mother missed several drug tests, either because she affirmatively refused to be tested or was not present. One witness testified that Mother missed at least three, perhaps four, drug tests just in the month of December 2012. In the thirteen months of the pendency of the case, the magistrate found that Mother did not demonstrate any ability to maintain sobriety for any extended period of time while not incarcerated. Mother's most recent, admitted use was roughly two months before trial, at a time when she was pregnant. There is substantial and competent evidence supporting the finding that Mother struggled with historic and ongoing substance abuse issues. Even taking the testimony regarding her status in treatment in a light most beneficial to her, Mother was, at best, only half-way through an intensive outpatient treatment program and had only maintained sobriety for a period of two months or less. The magistrate did not err in making its finding that Mother had continuing issues with substance abuse.

### 4. Ability to parent

Lastly, as a general challenge to all the magistrate's factual findings, Mother points to evidence that she was capable of taking care of her daughter while sober and while medicated for her mental health diagnosis, was only three to six months away from completing treatment, was submitting to drug tests twice per week, had housing where the daughter could reside with her, and was continuing to have visitations with her daughter. Mother also indicated that she had two job interviews she would be finding out about shortly after the termination hearing and she intended to remain on her medication.

In stressing these facts, Mother essentially asks this Court to reweigh the evidence. It is well established that appellate courts in Idaho do not reweigh evidence. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). Instead, we defer to the trial court's unique ability to accurately weigh the evidence, judge the demeanor of the witnesses, and have a superior view of the entire situation. *Id.* The magistrate here took into account all the evidence and determined that both neglect and an inability to discharge parental duties for a prolonged, indeterminate period of time existed as statutory grounds for termination. In making all its findings of fact and its ultimate determination, the magistrate stated:

> [Mother] <u>may</u> be able to maintain sobriety for a period of time, and <u>may</u> be able to someday have stability in housing, in employment, and in life in general, but she had demonstrated that she posed a real risk to [the daughter]'s safety in December 2011, and that she continues to pose a significant risk to [the daughter]. [Mother] is neither a fit nor proper person in who to entrust this child.
>
> Termination of [Mother]'s parental rights is in [the daughter]'s best interest. The evidence is not only clear and convincing that [Mother] has neglected the child; the strength of the evidence is overwhelming.
>
> [Mother] is absolutely not in any better position than she was when she abandoned [the daughter] in December 2011.

There is substantial and competent evidence to support the magistrate's decision.

Mother also attempts to show error by the magistrate by relying on *Doe v. State*, 137 Idaho 758, 53 P.3d 341 (2002) and *Idaho Dep't of Health and Welfare v. Doe III*, 150 Idaho 752, 250 P.3d 803 (Ct. App. 2011). We are not persuaded. In *Doe*, 137 Idaho 758, 53 P.3d 341, the Supreme Court reversed a magistrate's decision to terminate parental rights because, once the incarcerated father learned of his child, the father took all steps he could take while in custody to establish a relationship with the child. That case was decided in relation to the statutory ground of neglect and the Court determined the father, incarcerated throughout the pendency of the case,

11

did everything in his power to act as a parent. In *Doe III*, 150 Idaho 752, 250 P.3d 803, this Court held that a magistrate's decision to terminate a father's parental rights was erroneous. In determining that the father had neglected his children, the magistrate had focused on evidence showing deficits in the father's actions that were not actually required by the case plan and the magistrate did not focus on the substantial compliance with the case plan and the father's need for only a couple of months additional time to be in a position to parent his children. We reversed the magistrate's decision in light of evidence that the father maintained sobriety for a period of eight months during which time he vigorously sought treatment and consistently attended support groups, maintained employment, exercised visitations and exhibited appropriate parenting behavior during those visits, and was in the process of reinstating his license and obtaining stable housing.

We do not find Mother's situation comparable to either of the parents in the above cases. Here, we have evidence of Mother's conduct outside of custody and, thus, the rationale in *Doe*, 137 Idaho 758, 53 P.3d 341 is largely inapplicable. Further, the father in *Doe III*, 150 Idaho 752, 250 P.3d 803 maintained sobriety for several months prior to the termination hearing, had earnestly and consistently sought treatment during that time, had stable employment, and had voluntarily undertaken efforts to make further improvements in his life such as taking anger management courses and reinstating his driver's license. Here, Mother had refrained from abusing drugs for a period of only two months or less, had used drugs while pregnant, had not been employed and could only speculate about job prospects, had been inconsistent in her treatment and missed drug tests, and had only just begun a medication regimen to address her mental health. Rather than having a fairly determinate time frame within which Mother would be available to parent, Mother was, at best, only in the middle of her treatment and evidence did not show whether she could maintain sobriety. Consequently, the evidence here does not support reversal based on the authorities Mother cites to this Court.

**B.      Whether Termination was in the Best Interests of the Child**

Mother asserts that the magistrate erred in determining termination of parental rights was in the daughter's best interests. Mother argues the magistrate failed to take into account Mother's own testimony that her daughter loves her and is happy when she sees Mother, and that Mother is rising to the occasion to be a better parent. Mother also points to testimony that it is

evident Mother and the daughter have a bond and Mother has done well during her visitations with the daughter.

Despite the evidence Mother put forward to challenge the magistrate's findings, there is also ample evidence showing it was in the daughter's best interests to terminate Mother's parental rights. There were seven prior child protection referrals regarding Mother and her daughter due to the daughter testing positive for marijuana at birth, a hazardous home environment, exposure to drug use (both methamphetamine and marijuana), and Mother's prostitution. In April 2012, Mother acknowledged that her life choices up to that point were unfair to her daughter and, though she loved the child very much, she should not continue to be her parent. In terms of Mother's interactions with her child during visitations, Mother played with the child, interacted with and encouraged her, and disciplined her well. The visitation supervisor testified that in the limited time of visitations, the parenting behavior exhibited was very appropriate. However, the visitation supervisor had concerns about the choices Mother made regarding where to live, how to live, with whom to live, the people she was in contact with, how she responded to stress and authority figures, and the kind of role modeling those choices exposed the daughter to. The guardian ad litem testified that she had only seen positive changes in Mother in the thirty days prior to the termination hearing and that the daughter had been placed in counseling based on concern about attachment issues due to the instability the daughter had experienced in her life.

The magistrate acknowledged some of the positive attributes Mother displayed as a parent and accepted that it was possible Mother could comply with substance abuse treatment and mental health recommendations and it was possible she may get into a housing assistance program. Nonetheless, the magistrate determined Mother's "chronic instability, ongoing drug use, untreated mental health, and persistent pattern of violations of the law resulting in incarceration" all presented a risk to the daughter. In addition to Mother's history, the magistrate also relied upon the facts that Mother had demonstrated she had very recently put her unborn child at risk by using drugs while pregnant and that the possibility of stability in treatment of substance abuse and mental health, housing, and employment where speculative at best. Additionally, the witnesses who testified as to Mother's appropriate and positive parenting skills during visitations and the bond between Mother and her daughter also opined that it was in the best interests of the daughter to terminate Mother's parental rights because Mother did not

13

demonstrate the ability to be a stable or consistently available parent. The magistrate's determination that it was in the best interests of the daughter to terminate Mother's parental rights is supported by substantial and competent evidence, and accordingly, there is no error.

## IV.

## CONCLUSION

We conclude the magistrate did not err in finding that statutory grounds for termination existed to support terminating Mother's parental rights and that it was in the best interests of the daughter to do so because each determination is supported by substantial and competent evidence. Accordingly, we affirm the decree of the magistrate terminating Mother's parental rights.

Judge GRATTON and Judge MELANSON **CONCUR.**